# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr>
<td>

In the Matter of the Termination of


N.F.W.   DOB: 2/9/13
D.F.H.   DOB: 1/21/09
K.W.W.  DOB: 11/16/03
S.L.W.   DOB: 12/21/01,

          Minors,

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

          Respondent,

          v.

NICOLE E. WOODS,

          Appellant.

</td>
<td>

No. 75314-2-I
consolidated with
No. 75315-1-I
No. 75316-9-I


DIVISION ONE




UNPUBLISHED OPINION


FILED: April 24, 2017

</td>
</tr>
</table>

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2017 APR 24 AM 10: 51

MANN, J. – Following two dependencies during which Nicole Woods made little progress with services, the superior court terminated her parental rights. Woods appeals, arguing the Department of Social and Health Services (Department) failed to prove that it provided reasonably competent case management, and that it satisfied the statutory prerequisites to termination. Because proof of reasonably competent case

management is not a prerequisite to termination, and because the Department met its burden under the statutory criteria, we affirm.

FACTS

Pretrial History

Woods is the biological mother of three daughters, N.W., D.H, K.W, a son, S.W., and a fifth child who is not at issue in this case.[1]

In 2009, the superior court entered an agreed order of dependency as to D.H., K.W., and S.W. The order referenced a history of CPS referrals dating to 2003 and stated the children had no parent or guardian capable of caring for them. The facts supporting dependency included physical abuse, lack of supervision, and substance abuse. The order noted that in 2008, Woods signed service plans requiring her to engage in random urinalysis (UA), a drug and alcohol evaluation, parenting classes, and finding appropriate housing. The court found that while Woods had engaged in family preservation services and a parenting class, she had not participated in a drug and alcohol evaluation and random UAs. The court ordered a drug and alcohol evaluation, parenting classes, mental health counseling and any treatment recommendations, family preservation services, and random UAs twice a week.

In October 2010, the court entered a permanency planning order. The order stated that Woods had only partially complied with services. She completed parenting classes, family preservation services, a drug and alcohol evaluation and random UAs.

---

[1] The parental rights of the fathers were terminated via separate orders and are not at issue in this proceeding.

She also visited the children on a regular basis. She had not completed her drug and alcohol treatment or mental health services and had three positive UAs.

In March and August 2011, dependency review orders again noted that Woods had not completed drug and alcohol treatment, mental health services, or UAs. The Department filed a petition to terminate Woods' parental rights.

In October 2011, the Department voluntarily dismissed the dependency and termination proceedings and initiated a third-party placement with Andrea Campbell, a relative the children had lived with for several years. The court noted that Woods had only partially complied with substance abuse services and had not complied with UAs and mental health services. The court found that placement with Campbell was in the children's best interests.

In September 2014, the court initiated a second dependency by agreed order. The agreed facts included Woods' failure to fully comply with services during the first dependency, her failure to return the children to Campbell following a weekend visit in 2012, reports of Woods' "drug and alcohol abuse/exposure and physical injuries to the children without immediate medical follow up," allegations that she struck S.W. with a belt and closed fist while intoxicated, positive tests for amphetamines and cocaine, and 2010 convictions for malicious mischief, attempted forgery, hit and run unattended, and taking a motor vehicle without permission.

The court ordered Woods to participate in a drug and alcohol evaluation and any treatment recommendations, random UA testing, and a psychological evaluation with parenting component and any treatment recommendations.

3

In its first dependency review order, the court found Woods had not complied with any court-ordered services and had not visited the children on a regular basis.

In March 2015, Woods requested information about placing the children with their great-grandmother in California.

In June 2015, the court entered a permanency planning order. The court found Woods had completed the second part of her psychological evaluation but had not complied with any other service requirements. The order stated that Mary Cannon—the children's great-grandmother in California—had expressed interest in placement and that a referral for an ICPC home study was underway.

In August 2015, the Department filed a petition to terminate Woods' parental rights.

In September 2015, the Department received a completed home-study approving placement of K.W., D.H., and N.W. with their great-grandmother in California.

In January 2016, the court entered another dependency review order stating that Woods had not complied with court-ordered services. The order added that "[a]n ICPC for the maternal great-grandmother was recently approved, however the Department is still assessing whether this relative placement would be in the children's best interest."[2]

In February 2016, shortly before trial, Woods moved to place K.W., D.H., and N.W. with the great-grandmother in California and to continue the termination trial so that the parties could discuss alternatives to termination. The motion and supporting declarations alleged that Woods and her counsel had only recently learned of the home

---

[2] "ICPC" stands for Interstate Compact for the Placement of Children.

study approval. The Department opposed Woods' motion, arguing that the children were in a stable placement, moving the girls to California would separate them from their brother, S.W., the great-grandmother's residence, unlike the current placement, was not adoption approved, and Woods had not explained "what alternative arrangement she would be seeking." The Department specifically noted that no guardianship petition had been filed. The Department also alleged that Woods told a social worker in October 2015 that "even though the ICPC with Ms. Cannon was approved, [Woods] wanted the children to remain in their current placement." The court denied a continuance and reserved the placement issue.

Termination Trial

Trial commenced in March 2016. Marissa Camp, a Department social worker and supervisor, testified that she was the children's primary social worker from July 2014 to August 2015. Social worker Kristen Meyer later took over for Camp, followed by social worker Doug Bowling in late 2015. Camp supervised Meyer and Bowling during their work on the case. Bowling returned the case to Camp in early 2016.

Camp testified that she initially communicated with Woods by phone, but Woods instructed her to use e-mail and to not call her by phone. Camp "attempted throughout this case multiple times each month to set up meetings with . . . Woods to discuss her case and services." Woods did not show up for most of the meetings.

Camp testified that she referred Woods to New Traditions—an agency Woods herself selected—for a drug and alcohol evaluation. She offered to provide transportation to New Traditions "throughout the case" but Woods declined. She

5

provided Woods "with bus tokens to get her to that evaluation, which she declined." Camp offered Woods other drug and alcohol agencies as well, but Woods never obtained the evaluation. When Camp asked what prevented her from following through, Woods did not identify any barriers that Camp had not addressed. Camp noted that Woods had a working vehicle "for much of this case."

Camp also repeatedly referred Woods to New Traditions for UA testing. She gave Woods bus tokens and offered to drive her to the tests. She even changed the frequency and location of the testing to make compliance easier, but Woods still did not follow through.

Camp received the court ordered psychological evaluation on May 20, 2015, and informed Woods of its arrival a week later. They agreed to meet the next day to discuss the evaluation and its recommendations, but Woods did not show up. Camp sent a copy of the evaluation to Woods' counsel "shortly after [she] received it." She also discussed the evaluation with counsel in June or July of 2015.

Camp "continued to set up meetings . . . multiple times per month for the following months" but Woods still did not show up. Camp testified that she could not e-mail the evaluation to Woods because Department rules prohibited sending sensitive mental health information to an unsecure e-mail address. In a June 2015 e-mail, Camp told Woods:

> I am aware that we have not discussed the recommendations, which is one of the reasons I have been trying to meet with you. Please let me know when you are available to meet to . . . go over the recommendations from your psychological evaluation, and discuss the status of your case and your participation in services. I planned to give you a copy of your psychological evaluation when we met, but can send you a copy in the

mail if you can provide me with an address. As a matter of practice, I do not send psychological evaluations to unsecure email addresses due to the sensitivity of the information.

Camp testified that, "as a matter of practice, we just don't hand over psych evals without the opportunity to review it with clients." She noted that the first paragraph of the evaluation warned that the report was not intended for review by the examinee because it could be detrimental, distressing, or damaging. She stated:

> I can't just give her the [evaluation]. Dr. Shepel and every other psychologist that I work with does not permit me to simply hand the evaluation to the client for them to read on their own. It's supposed to—it can be damaging. It can be harmful for a client to read a psychological evaluation on their own without adequate understanding of what it means.

Camp conceded that Woods requested a copy of the evaluation and testified that she offered to give her a copy: "She just needed to meet to discuss it."

Camp testified that, based on e-mail correspondence between Meyer—the social worker who replaced Camp—and Woods, she knew that Meyer gave Woods a copy of the evaluation and discussed it with her on October 6, 2015.

To Camp's knowledge, Woods never participated in any of the services recommended in the evaluation. When asked if Woods complained of any obstacles to receiving services, Camp identified homelessness and transportation. Camp said she provided Woods a list of shelters and transitional housing programs. She offered Woods a phone to use and offered "to call with her." She testified that "[a]ny time [Woods] indicated that she was applying for a housing authority and needed a referral . . . , I made a referral with the information that she needed." Camp continued to offer her assistance with housing throughout the case.

7

Camp testified that most her clients are homeless during dependency proceedings and that some successfully participate in services and visitation. In her experience, the difference between homeless parents who succeed and those who do not is "the commitment towards reunification . . . and doing whatever it takes to have [the children] returned."

Camp recalled a March 2015 conversation in which Woods said "she was struggling because of her homelessness such as having to sleep in her car" and "requested that her children's case be sent to California." Woods offered to relocate there and do services while the children were placed with their great-grandmother. Camp explained that she needed an "ICPC" approval from California before that could happen.

Camp acknowledged receiving ICPC approval for placement with the great-grandmother in California in September 2015. Camp testified that Meyer told Woods about the approval in their October 2015 meeting, but the court struck the testimony as hearsay. Camp said she gave Woods' new counsel a copy of the ICPC approval in discovery in early 2016.

Camp estimated that Woods participated in fewer than half of her visitation opportunities. She told Woods that the missed visits negatively affected the children, but Woods' visitation did not improve. Camp tried to set up meetings to talk to Woods about visitation and visitation rules, but Woods did not follow through until shortly before the termination trial.

Camp testified that all necessary services had been offered or provided, that Woods made no progress in correcting her substance abuse, mental health issues, and parenting deficiencies, and that she was unfit to parent the children. Camp did not think the children could be returned to Woods in the near future. She also noted that the children had prospects for adoption. She testified that the children had "been in limbo" for several years, have waited for resolution about where they're going to be, "[a]nd they deserve resolution to their case and they have [a] right to permanency." Camp concluded termination was in the best interests of the children.

Following a month-long recess in the trial, Camp testified that Woods had not participated in any services during the recess and attended only one visit with the children during that time. She sent Woods "countless e-mails about UAs," and referred her to a more convenient location to do her UAs, but "she didn't complete any subsequent UAs." She also referred Woods for a drug and alcohol evaluation at her preferred location and repeatedly informed her of the hours during which she could receive the evaluation.

Leah Hill, the Court Appointed Special Advocate (CASA) for the girls, testified that termination was in their best interests. She stated that Woods' participation in services decreased in the second dependency and she had not, in either dependency, shown "that she is able to give [the children] permanency and stability." Hill believed K.W. and D.H. were bonded with their mother but the children's need for permanency was paramount:

> [T]hese kids have been in the dependency system for. . . a fair amount of
> their lives and they are in very desperate need of permanency. They've

been in a stable home for a while now, but they still . . . have confusion about where they're going to be for their childhood. And they need that permanency and they need to know that.

Woods testified that she was homeless from the beginning of the dependency until November 2015. She claimed her homelessness made it difficult to make appointments and comply with services. During the first six months of the dependency, she lived in a Tacoma shelter and had difficulty making appointments at Woods' office in Seattle. This was due in part to the distance, transportation difficulties, and the fact that she had to be back at the shelter in Tacoma by 5 p.m. Woods testified that homelessness also took much of her time, making it more difficult to meet dependency obligations:

> [E]very day that you wake up and you're homeless, you don't know whether you're going to eat, you don't know whether you're going to shower, or see your kids or be able to make it to them because you don't know where you're going, you know.
>  . . . .
> It's very difficult. It's frustrating. It's hard.. . . When I wake up . . . first thing on my mind is where am I going to go that night and who can I talk to or who can I call, you know. When am I going to, what am I going to eat? Where am I going to shower to be able to go places where I would have to go? How am I going to get there? . . . Hopefully I'll make it in time. . . . It's frustrating.

Woods acknowledged receiving housing information and e-mails from Camp and communicating with her by phone.

Woods testified that she missed some visits due to mechanical trouble with her car, miscommunication, late bus service that arrived beyond the 15-minute grace period for visits, lack of funds, and bus tokens. Woods acknowledged receiving at least four books of $50 worth of bus tickets as well as Sound Transit tokens.

Woods said she had difficulty completing her UA requirement due to the testing locations and/or collection times. She also testified that she wanted to enter family treatment court but decided it would be too time consuming and would not work with her other commitments.

Woods claimed she did not learn until August 2015 that there were additional service recommendations in the psychological evaluation. She did not know what those services were until she received a copy of the evaluation from Meyer in October 2015. Woods said Meyer did not discuss the service recommendations and simply handed her the evaluation.

Although Woods checked her e-mail on her phone, she could not always open e-mail attachments. She would sometimes use a computer at the library to access her e-mails and attachments. Nevertheless, she testified that she was unable to open "a lot" of e-mail attachments.

On cross-examination, Woods conceded she had not completed the drug and alcohol evaluation or 90 days of clean UAs ordered in the 2014 dependency order. She also conceded that it had been at least a year since she participated in UA testing.

Following a one month continuance, Woods resumed her testimony. When asked if she had participated in any services during the recess, Woods said she attended one counseling session but had no verification with her. When asked what she had done to obtain housing, Woods said "I'm just kind of looking for a place."

Monique Jackson, Woods' neighbor in 2014, described her as a loving and responsible parent. She had never seen Woods use drugs.

On April 26, 2016, the court gave an oral ruling terminating Woods' parental rights, stating in part:

> This proceeding . . . is not about Ms. Woods' intentions. . . . She does love her children and does want the best for them. The problem is this intention is a mile wide and an inch deep. What has been needed and has been lacking is the commitment to actually do the work that was and is required to truly serve the children's best interests.
>
> . . . .
>
> Twenty months down the road, she has not obtained the substance abuse evaluation that was to be done within 30 days. When asked on the stand, she said a couple of times "I didn't get a chance." She did have a chance, but she chose not to take it. Without this evaluation, she could not as required follow all of its treatment recommendations.
>
> She has participated only sporadically in the random urinalysis requirement . . . .
>
> She's taken no steps to begin the type of counseling that Dr. Shepel felt might hold out some hope of breaking down her irresponsibility, denial, and sense of entitlement. And so she continues at trial to place blame on social workers, visitation supervisors, [S.W.], the foster parents, her own attorney, and anyone else except herself.
>
> . . . .
>
> Sporadic is also an apt description for her participation in visitation. Her failures to appear for arranged visits have harmed the children psychologically.
>
> . . . .
>
> All of the experts agree that these children have been in the foster care system and kept in limbo for far too long already. It's past time for them to become fully assimilated into nurturing, permanent, and stable homes.

Findings and Conclusions

On May 5, 2016, the court entered findings, conclusions and an order terminating Woods' parental rights. The court found in pertinent part:

> 2.14 All necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided to the mother.
>
> . . . .
>
> 2.16 [T]he mother was repeatedly referred for a drug/alcohol evaluation, but has not participated in such an evaluation since September 5, 2014. The mother was repeatedly referred for random urinalysis testing to verify her sobriety, at multiple sites including sites chosen by the mother, but has not participated in

any urinalysis testing since 10/01/14, with the exception of a UA performed . . . during the termination trial (result: negative). The mother was provided with a psychological evaluation, and offered the services recommended by that evaluation.

2.17 The mother was referred to Dr. Shepel for her psychological evaluation . . . which is the only court-ordered service that the mother completed. The Department provided the mother with bus tickets to enable transportation to her other services and to visitation.

2.18 . . . . Dr. Shepel noted several specific concerns about the mother's presentation, including that:

- the mother believed that counseling was needed between her and her son, but the mother felt that the purpose of the therapy was not to induce any changes in herself but to convince [S.W.] to listen to and obey her;
- the mother completely denied her well-documented substance abuse history and did not appreciate that her substance abuse had impacted her life or her parenting;
- the mother's expressed parenting beliefs were punitive and lacked empathy for the children or recognition of their emotional needs;
- the mother did not acknowledge any parenting deficits or any personal responsibility for the fact that her children had been placed out of her care;
- the mother did not take responsibility or express any remorse for her criminal history, depicting her convictions as the results of mistakes rather than intentional wrongdoing;
- at the third appointment the mother appeared significantly intoxicated, displaying irritability/hostility and sleepiness and depressed motor skills and a lack of cooperation or responsiveness to Dr. Shepel's questions. Although her behavior was drastically different than it had been in the prior appointments, the mother denied to Dr. Shepel that anything was wrong.

2.19 . . . .Dr. Shepel diagnosed the mother with Personality Disorder with Borderline and Anti-Social Traits, Characteristics exhibited include a lack of empathy, a low tolerance for stress, an inability to admit to personal shortcomings with associated transfer of blame, defensiveness, low motivation to engage in remedial treatment, significant distrust of others, a propensity for violent relationships with romantic partners, and a profoundly high expectation of strict obedience by her children. Dr. Shepel specified that the mother's diagnosis is extremely difficult to treat, requiring committed and long-term treatment, and that success in treatment is generally low since persons with this disorder often are inclined towards habitual self-destructive coping skills including substance abuse rather than committing to long-term mental health treatment.

2.20 . . . . Dr. Shepel recommended that the mother participate in remedial services including parenting classes, mental health services, UA testing, substance abuse treatment, and domestic violence education.

. . . .

2.21 The Department has made extensive efforts to communicate with the mother about her housing, visitation, service requirements, and her children's welfare via letters and email as well as via phone, requesting individual in-person meetings, and group meetings. Those communications also included efforts to notify the mother of the results of Dr. Shepel's evaluation and to engage the mother in the services recommended by Dr. Shepel. A copy of the report was immediately provided to the mother's attorney but the mother was not responsive to requests from the social worker for a required in-person meeting at which the mother could review it with the social worker. That meeting–and direct delivery of the report—occurred in October. The mother did not subsequently participate in any of the services recommended by Dr. Shepel.

2.22 The Department has provided the mother with information about multiple housing assistance resources, but since September 5, 2014, she has not been able to obtain stable housing appropriate for placement of her children. While lack of stable housing presents an additional obstacle to a parent seeking to participate in services, social worker Marissa Camp testified to her experience working with many homeless parents who were able to participate in services and visitation and successfully reunify with their children; per her observation a parent's success depends primarily on their motivation and level of dedication to having the children returned to their care.

. . . .

2.24 Dennis Turner runs a visitation agency that accepted a contract to supervise the mother's visitation in November of 2014. The mother only made one visit during November and December so his agency cancelled that contract. The agency accepted another contract in March of 2015, but was unable to reach the mother to begin visitation until May or June. That contract was cancelled in August after the mother missed three visits by failing to appear or to confirm in advance as required by her contract.

2.25 The termination trial was recessed . . . between 3/24/16 and 4/25/16. . . . [T]he mother engaged in only one visit . . . [and] did not engage in any services between 3/24/16 and 4/25/16.

. . . .

2.31 The mother has made no progress in addressing her substance abuse. A single negative UA result obtained during the termination trial is not a reliable indication that the mother has been or is able to maintain sobriety on an ongoing basis. At trial she denied any current or prior substance abuse issue, despite the documented history in her 2009 dependency, [S.W.]'s report that [she] was drunk when she assaulted him on 6/3/14, the positive test results for amphetamines

14

and cocaine on 7/02/14 and 7/03/14, [and] Dr. Shepel's experienced observation that [she] appeared significantly intoxicated at one of the three appointments for her psychological evaluation in 2015. At trial the mother testified that she did not assault [S.W.] and was not drunk, but that he threw a tantrum and made up that story after she declined to let him go over to his father's house. The court did not find the mother credible at the shelter care hearing at which the incident with [S.W.] was litigated. . . . Notably at trial the mother never admitted to any responsibility or fault on any single issue. . . . For these reasons, as well as the results of the mother's psychological evaluation and observation of the mother's testimony at trial, this court finds that [she] is not a reliable and credible reporter about facts which could reflect negatively upon her.

. . . .

2.34   The mother is incapable of safely parenting these children and is currently unfit to parent the children. There is little likelihood that conditions will be remedied so that the children can be returned to the mother in the near future. Throughout the dependency the mother has demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies. This is the mother's second dependency, and in both dependency actions she has been offered but has declined to fully participate in necessary remedial services. Per the mother's testimony at trial, she does not recognize that she has or did have any parental deficiencies in need of correction.

2.35   Continuation of the parent-child relationship clearly diminishes the children's prospects for early integration into a stable *and* permanent home. These children are adoptable and have prospects for adoption. The children cannot be adopted unless parental rights are terminated. The mother's inconsistent visitation has been a source of emotional harm to the older children, and while the mother's rights remain intact [the children] will remain in an unhealthy state of emotional limbo which could inhibit their ability to put down psychological roots in a permanent home (this concern is less pronounced as to [N.W.] at the moment due to her young age and more limited history with the mother).

2.36   Termination of parental rights is in the best interest of these children. The mother will not be able to remedy her parental deficiencies or provide the children with a safe, stable, and permanent home in the near future. The children have a right to a safe, stable, and permanent home, and to a speedy resolution of this termination proceeding. While [K.W.] is very attached to her mother, it is not in [K.W.'s] best interest that she be deprived of permanency while waiting for the mother to make progress that the mother has demonstrated her inability to accomplish.

2.37   The . . . girls are placed together and the caretakers arrange bi-monthly contact between the girls and [S.W.]; until the children are adopted the juvenile

court will have continuing authority to direct ongoing contact, and there is no reason to believe that this contact will not persist. The court has taken this information into account when determining that termination of parental rights is in the children's best interest.[3]

The court concluded that the Department proved the statutory criteria for termination by clear, cogent, and convincing evidence and that termination was in the children's best interests. Woods appeals.

## STANDARD OF REVIEW

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence[4]:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . and

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

---

[3] (Emphasis added.)
[4] "Clear, cogent and convincing" means highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

RCW 13.34.180(1). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(2).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing . . . ." In re Aschauer's Welfare, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. A.V.D., 62 Wn. App. at 568; In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

## ANALYSIS

### I

Woods contends the court erred in terminating her parental rights because the Department failed "to establish by clear, cogent, and convincing evidence that the . . . social worker(s) provided reasonably competent case management throughout the dependency." But the cases she cites in support of this contention do not require such proof for termination. Rather, they hold that where a dependency service would not be

futile, delays or omissions in providing the service may undermine a finding that all necessary services were offered or provided as required by RCW 13.34.180(1)(d).[5] Accordingly, we review Woods' claims of caseworker incompetence in the context of the Department's burden to demonstrate the provision of all necessary services.

Services Recommended by Dr. Shepel

Woods first claims the Department unreasonably delayed the provision of the services recommended in Dr. Shepel's psychological evaluation. She contends Camp's decision to "draw a line in the sand and require . . . a face-to-face meeting with [Woods] before she would make referrals" for the recommended services was unreasonable and responsible for a five-month delay. She assigns error to finding of fact 2.21, which states in part:

> 2.21 The Department has made extensive efforts to communicate with the mother about her . . . service requirements . . . via letters and email as well as via phone, requesting individual in-person meetings, and group meetings. Those communications also included efforts to notify the mother of the results of Dr. Shepel's evaluation and to engage the mother in the services recommended by Dr. Shepel. A copy of the report was immediately provided to the mother's attorney but the mother was not responsive to requests from the social worker for a required in-person meeting at which the mother could review it with the social worker. That meeting – and direct delivery of the report - occurred in October. The

---

[5] In re Welfare of S.J., 162 Wn. App. at 881-84, 256 P.3d 470 (2011) (reversing termination due to Department's failure to timely provide court-ordered mental health service that might have helped the parent progress in other services at an earlier stage and would not have been futile), In re Dependency of T.L.G., 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005) (where "protracted delay" in obtaining psychological evaluations was not "solely (or even mostly)" caused by the parents, there was no reason why mental health services could not be provided pending the evaluations, and there was no finding parents could not have benefitted from the services, the delay and "false premise that all other services should await the [evaluation] results" fatally undermined the court's finding that necessary services were offered), and In re Dependency of H.W., 92 Wn. App. 420, 426-30, 961 P.2d 963 (1998) (termination was premature where Department did not offer parent disability services and record did not support finding of futility).

mother did not subsequently participate in any of the services recommended by Dr. Shepel.[6]

Woods claims that even if a meeting to go over the evaluation was necessary, the Department had no good reason to delay referrals for the services recommended in the evaluation. We disagree.

As the Department points out, Woods' "position fails to note the reasons given by Ms. Camp for an in-person meeting, and also ignores the many meetings that [Woods] agreed to, but then failed to appear for." Camp testified that she did not let Woods "know what the recommendations were because we had not gone over the evaluation and why they were being recommended. I felt that for [Woods] to buy into the services, she needed to understand why there was concern." This was a reasonable strategy, particularly given Camp's testimony, and the trial court's finding, that Camp repeatedly attempted to meet with Woods over the next five months and Woods simply did not follow through. Thus, contrary to Woods' assertions, and unlike the cases she cites, the delay in referring her for services recommended in the evaluation was not without a reasonable basis and was based on Woods' failure to follow through, not the Department's.

The Department also argues, and we concur, that earlier referrals for the services would have been futile and/or would not have remedied parental deficiencies in the foreseeable future. "Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." In re Matter of K.M.M., 186 Wn.2d 466, 483, 379 P.3d 75 (2016);

---

[6] (Emphasis added.)

In re Welfare of M.R.H. and J.D.F., 145 Wn. App. 10, 25, 188 P.3d 510 (2008); D.L.B., 188 Wn. App. at 920. This rule applies not only to omitted services, but also to claims that services should have been provided at an earlier point in time. In re Welfare of K.J.B., 188 Wn. App. 263, 282, 354 P.3d 879 (2015), reversed on other grounds, 387 P.3d 1072 (2017). In addition, even when DSHS "inexcusably fails" to offer or provide necessary services, "termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future." In re Dependency of T.R., 108 Wn. App. 149, 164, 29 P.3d 1275 (2001); see also In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

It is undisputed that Woods failed to complete the court-ordered services in either of her dependencies. In the instant case, she did not respond to Camp's multiple attempts to meet with her about the psychological evaluation and made little if any effort to participate in Dr. Shepel's recommended services during the six months between receipt of the referrals and the end of trial. She never obtained the court-ordered drug and alcohol evaluation, participated in only one UA test after October 2014, failed to attend most of the available visits with her children, and continued at trial to blame everyone but herself for her lack of progress. In these circumstances, earlier provision of the services recommended by Dr. Shepel would have been futile and would not have remedied Woods' parental deficiencies within the foreseeable future.

Housing Services / Referral to Solid Ground

Woods next claims the Department should have timely referred her to Solid Ground—a housing service that helped her clear up her credit and make progress

20

toward stable housing near the end of the dependency. She claims the Department's omission created "an unnecessary barrier that delayed [her] ability to access a much needed support in stabilizing her life so she could meaningfully engage in reunification efforts." Had the Department timely referred her to Solid Ground at the beginning of the dependency, she argues, she "would have been in a far better position to engage in services and more consistently visit with her children." The record belies these claims.

Initially, we note that Solid Ground was neither a court-ordered or recommended service. We also note that, contrary to Woods' claim that "there was never a referral to Solid Ground," Camp testified that she did, in fact, refer Woods to Solid Ground.[7] In any event, the record supports the court's findings that the Department "provided the mother with information about multiple housing assistance resources" and offered or provided all necessary services, including housing. Camp testified she provided Woods

> with a list of shelters and transitional housing programs. I offered a phone for her to be able to call those to inquire about availability. I offered to call with her. Any time that she indicated that she was applying for a housing authority and needed a referral from the Department, I made a referral with the information that she needed. And I continued to offer her throughout the case my assistance with applying for housing or calling shelters.

In a January 2015 e-mail, Camp reminded Woods to "call 211 and get on the Family Housing Connections list" and offered to help her if she needed assistance. Another January 2015 e-mail included an attached list of shelters and stated in part:

> If you would like to come into my office to use the phone to call these shelters, I would be more than happy to help you call and make a phone

---

[7] [State]: And did you ever refer her to Solid Ground?
[Camp]: Yes, I did.

21

available for you to use. . . . I also encourage you to call 211 ASAP and get on the waitlist for Family Housing Connections.

The attachment contained several pages of information on shelters for adults and families.

In a May 2015 letter to Woods, Camp again included "a list of shelters and housing resources" and stated:

I continue to be available to assist you in calling these resources in order to locate options available to you. I have made a number of attempts at setting up meetings with you to assist, but you have either not responded or no-showed . . . . Please know that I continue to be available to assist you in your efforts to locate housing.

Thus, the record supports the court's findings that the Department offered or provided all necessary housing-related services. Nothing in the record supports Woods' implicit claim that she could only find suitable housing through Solid Ground. To the extent Woods claims she needed assistance with her credit and/or financial aspects of housing, the record demonstrates that Camp stood ready to provide Woods with any additional service she needed.

Delayed Disclosure of Home Study Approval

Woods also claims the Department failed to promptly inform her that the home study of the children's great-grandmother's California residence had been approved. She contends the delay prejudiced her ability to "fully litigate whether relative placement with [the great-grandmother] was in the best interest of the girls." The Department counters that even if there was a delay,[8] Woods suffered no prejudice at trial because

_____

[8] Camp alleged in her declaration that caseworker Meyer informed Woods of the September 2015 home study approval in October 2015. Woods did not dispute that allegation prior to trial or move to

relative placement during a dependency is not relevant to the determination of whether the statutory criteria for termination are satisfied.

We reject Woods' claim for several reasons. First, Woods cited no authority in her opening brief indicating that placement during a dependency is material to the criteria for termination. While there is authority holding that an identified guardianship or other permanent placement option is material in termination proceedings under RCW 13.34.180(1) (f) ("continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."[9]), see In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013) (identified guardianship is material to termination decision), In re Welfare of H.Q., 182 Wn. App. 541, 553, 330 P.3d 195 (2014) (open adoption agreement is material), Woods did not mention those authorities or a guardianship in her opening brief. For the first time in her reply brief, she cited In re Welfare of R.H., supra, and raised the prospect of an "alternative to termination such as a dependency guardianship" as well as due process concerns. But arguments and authority cannot be raised for the first time in a reply brief. In re Marriage of Sacco, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990); King v. Rice, 146 Wn. App. 662, 673, 191 P.3d 946 (2008).

Second, even if Woods had raised the guardianship claim in her opening brief, she could not demonstrate prejudice. Nothing prevented Woods from filing a guardianship petition at any point in the dependency. Her grandmother had made her interest in placement known since at least 2009, and the June 2015 dependency review

---

strike the pertinent portion of Camp's declaration as hearsay. She did, however, successfully object to Camp's in-court testimony about her conversation with Meyer on hearsay grounds.

order expressly stated that a "referral for an ICPC is underway." At that point, all parties knew a home study was imminent. Yet, it appears neither Woods nor her counsel made any inquiries or took any action, such as filing a guardianship petition, over the next six months. Even when the Department pointed out the absence of a guardianship petition in its response to Woods' motion to change placement, Woods still did not file a petition. In these circumstances, we cannot say a delay in receiving the home study approval prejudiced Woods' ability to argue a guardianship alternative to termination.

Finally, the record does not support Woods' assertion that "there was a reasonable chance that the dependency court would have granted the motion [to place the children with their great-grandmother] if it had been brought before the court earlier." While Woods points out that relative placements are favored, such placements may be outweighed by other considerations, including "the child's existing relationships and attachments." RCW 13.34.130(3). In determining placement, the best interests of the child are the court's paramount concern. In re Dependency of J.B.S., 123 Wn.2d 1, 10, 863 P.2d 1344 (1993).

The proposed placement in this case would have required relocating three of the children to California and separating them from S.W. Both Camp and the CASA strongly opposed splitting up the children. Camp stated in her declaration that

> [t]he only consistent thing for [K.W., D.H., and N.W.] during this dependency matter has been their continued sibling contact with their older brother, [S.W.]. . . . The children see each other a minimum of two times per month as required, but it is often been more that this – they continue to celebrate birthdays together, go to church together, and go out

---

[9] (Emphasis added.)

for meals together. Separating [the girls from their brother] is contrary to their well-being.

The CASA corroborated Camp's view of the children's bond and its importance. She stated she "would be very concerned should the children be moved an entire state away from their brother [S.W.]."

Camp and the CASA also agreed that the children were suffering trauma from multiple disrupted placements and were "in desperate need of permanency." As the CASA noted, "[m]oving the girls would cause yet another traumatic experience as they would be in an entirely different state away from everyone and everything they know." The trauma would be heightened by the fact that the children barely knew their great-grandmother. Both Camp and the CASA believed the children were thriving with their current foster parents who, unlike the great-grandmother, were adoption approved.

Camp and the CASA also expressed concern that the great-grandmother was 73 and the youngest child was 3. They also feared that Woods would take advantage of a placement with the great-grandmother and abscond with the children as she did during the first dependency. The CASA believed there was "a very high probability" that Woods intended to do just that.

Camp requested "that the court maintain these children in their current placement, where they are stable, doing remarkably well, and able to maintain siblings and other important connections." She believed "[d]isruption to this placement, at this critical juncture, is contrary to their health, safety, and welfare." The CASA also opposed placement with the great-grandmother, stating that "permanency in a stable

and permanent home for the children is critical and overdue." She recommended "that these three girls remain in Washington with their stable and preadoptive placement."

For these reasons, we reject Woods' claim that an alleged delay in reporting the home study results for a nonpermanent relative placement prejudiced her during the termination trial.

II

Next, Woods contends the Department failed to satisfy RCW 13.34.180(1)(d) because it "failed to offer or provide court-ordered outpatient sobriety support group services." She points out that Dr. Shepel recommended, among other things, that she participate in "ongoing support from an outpatient [chemical dependency] group." The Department counters that "[t]he mother was undeniably offered [a] drug/alcohol evaluation, which is the umbrella service under which outpatient chemical dependency groups would be obtained." Woods does not dispute this claim in her reply brief.

In addition, it is clear from the record that even if this service could have been offered in the absence of a completed drug and alcohol evaluation, it would have been futile and/or incapable of remedying Woods' parental deficiencies in the foreseeable future. Woods never obtained the drug/alcohol evaluation ordered in the fall of 2014. She completed only one UA test after October 1, 2014. During the six months between receipt of Dr. Shepel's referrals and the end of trial, Woods made almost no effort to engage in the recommended services. Over the course of two dependencies, Woods "made no progress in addressing her substance abuse." Woods' contention fails.

26

III

*Conclusion of Law / Best Interests of K.W.*

Woods contends the Department did not carry its burden of proving by a preponderance of the evidence that termination was in K.W.'s best interest. RCW 13.34.190. Pointing to her strong bond with K.W., K.W.'s express desire to be placed with her mother, and evidence that terminating their relationship would harm K.W. emotionally, Woods contends the court's finding that termination was in K.W.'s best interest is not supported by sufficient evidence. We disagree.

It is well settled that when, as here, "a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests." T.R., 108 Wn. App. at 167. The trial court emphasized this point in its findings, stating that "[w]hile K.W. is very attached to her mother, it is not in [her] best interest that she be deprived of permanency while waiting for the mother to make progress that the mother has demonstrated her inability to accomplish." This finding is supported by Woods' lack of progress over two dependencies and testimony from Camp and the CASA that the children desperately needed permanency. As Dr. Shepel noted, "uncertainty is harmful for children. Children thrive when they have the predictable safe, stable and understandable . . . situation." The CASA testified that K.W. is "very happy in her current foster home," and K.W.'s foster parents were approved for adoption. No other permanent placement option existed at the time of trial.

27

In addition, Facebook messages between Woods and K.W. showed that their relationship could be harmful to K.W. In one message, Woods said she was going to "fight to my last breath to have you guys back at home. I will die before I let them take you away forever." Woods also told K.W. "I tried my hardest to protect you and failed. I hate myself." The court pointed out that Woods was "putting all the emotional weight on [K.W.'s] shoulders here, a 12-year-old girl." Woods responded that she was "talking about myself." The court replied, "Exactly. You're focused on yourself and not on your 12-year-old." In another text message, Woods told K.W. "I'm trying. I have no one at all. I'm so alone." The court found that Woods

> [i]nterpreted her text messages to [K.W.] dramatically differently than they read on their face, testifying that she was communicating emotional support to her daughter rather [than] what she was actually doing, which was placing the burden on the 12-year-old girl to provide the mother with emotional support.

The court's findings, including its finding that termination was in K.W.'s best interest, are supported by substantial evidence.

Affirmed.

_Mann, J._

We Concur:

_Trickey, ACJ_

_Spearman, J._